IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

LESLIE ROSS,

       Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

       Defendant.

No. C13-0016

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

I.    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  *PRINCIPLES OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.  *FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    *A.*   *Ross' Employment Background* . . . . . . . . . . . . . . . . . . . . . . 5
    *B.*   *Administrative Hearing Testimony* . . . . . . . . . . . . . . . . . . . . 5
        *1.*    *Ross' Testimony* . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        *2.*    *Vocational Expert's Testimony* . . . . . . . . . . . . . . . . 8
    *C.*   *Ross' Medical History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

V.   *CONCLUSIONS OF LAW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    *A.*   *ALJ's Disability Determination* . . . . . . . . . . . . . . . . . . . . . 14
    *B.*   *Objections Raised By Claimant* . . . . . . . . . . . . . . . . . . . . . 16
        *1.*    *Dr. Baldi's Opinions* . . . . . . . . . . . . . . . . . . . . . . 16
        *2.*    *Credibility Determination* . . . . . . . . . . . . . . . . . . 20
        *3.*    *Third-Party Statement* . . . . . . . . . . . . . . . . . . . . . 23

VI.  *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

VII. *ORDER* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## I.  INTRODUCTION

This matter comes before the Court on the Complaint (docket number 2) filed by Plaintiff Leslie Ross on March 5, 2013, requesting judicial review of the Social Security Commissioner's decision to deny her application for Title II disability insurance benefits. Ross asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits.  In the alternative, Ross requests the Court to remand this matter for further proceedings.

## II.  PROCEDURAL BACKGROUND

On March 6, 2009, Ross applied for disability insurance benefits.  In her application, Ross alleged an inability to work since March 31, 2003 due to cervical spondylosis, high blood pressure, restless leg syndrome, arthritis, depression, and suicidal thoughts.  Ross' application was denied on April 23, 2009.  On November 2, 2009, her application was denied on reconsideration.  On January 7, 2010, Ross requested an administrative hearing before an Administrative Law Judge ("ALJ").  On April 20, 2011, Ross appeared before ALJ Jo Ann L. Draper for an administrative hearing; however, the hearing was continued to allow Ross to obtain representation.  On August 25, 2011, Ross appeared in person with her attorney before ALJ Eric S. Basse for an administrative hearing.  Ross and vocational expert Roger F. Marquardt testified at the hearing.  In a decision dated October 3, 2011, the ALJ denied Ross' claim.  The ALJ determined that Ross was not entitled to disability insurance benefits because she was functionally capable of performing her past relevant work as an employment agency manager through March 31, 2008, her date last insured.[1]  Ross appealed the ALJ's decision.  On January 15, 2013,

---

[1] In order to receive benefits under Title II, a claimant must establish that he or she was disabled prior to the date her insured status expired.  In order to meet the requirements for insured status, a claimant must have 20 quarters of coverage in a 40-quarter period (continued...)

the Appeals Council denied Ross' request for review. Consequently, the ALJ's October 3, 2011 decision was adopted as the Commissioner's final decision.

On March 5, 2013, Ross filed this action for judicial review. The Commissioner filed an Answer on June 10, 2013. On August 12, 2013, Ross filed a brief arguing that there is no substantial evidence in the record to support the ALJ's finding that she is not disabled and that she was functionally capable of performing her past relevant work as an employment agency manager through March 31, 2008, her date last insured. On November 18, 2013, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On April 29, 2013, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance

---

[1](...continued)

ending with the first quarter of disability. *See* 42 U.S.C. §§ 416(i)(3)(B), 423(c)(1)(B); 20 C.F.R. § 404.130. Applying these requirements to Ross, her relevant time period for determining disability is from March 31, 2003, her alleged disability onset date, through March 31, 2008, her date last insured. *See* Administrative Record at 213-214.

but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id*. (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id*. (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id*. at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id*. Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v.*

*Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Ross' Employment Background

Ross was born in 1959. The record contains a detailed earnings report for Ross. The report covers the time period of 1978 to 2011. Except for 1978 and 1982, when Ross earned $33.13 (1978) and $2,867.40 (1982), she had no earnings until 1991. From 1991 to 2003, Ross earned between $3,180.00 (1991) and $73,989.50 (2001). She has no earnings since 2004.

### B. Administrative Hearing Testimony

#### 1. Ross' Testimony

At the administrative hearing, Ross discussed her difficulties with pain. First, Ross stated that she suffers from significant neck pain. Specifically, Ross testified that "[m]y neck pain cause[s] me to, in essence, not be able to function, I have difficulty doing just about anything."[2] For example, Ross stated that turning her head causes her so much pain that she can no longer drive. Ross also indicated that her neck pain radiates into her arms, hands, and fingers. She described her arm pain as burning and sharp. She also indicated difficulty raising her left arm over her head. Finally, Ross stated that her hands shake and

---

[2] Administrative Record at 52.

she gets numbness in her fingers causing her to have difficulty holding and grasping objects. Specifically, in response to questioning by the ALJ, Ross testified:

Q: Can you use a computer keyboard?
A: For only a few minutes, it's a very -- it's very difficult for me to put my hands out in front of me and do anything like that because of my neck and my arm.
Q: Can you --
A: And my fingers turn numb, so --
Q: Can you write?
A: Yes I can write some, I -- the paperwork that I filled out, my son had to help me with that because I couldn't complete it.
Q: Can you --
A: I did take quite a time -- a long time doing it as well.
Q: Can you button clothing or use zippers?
A: I can button, yes, and I can -- you know, I can zip my clothes, I think mainly because it's a -- it's an activity that I quickly do and then it's done, if it's anything that continues, you know, longer than just a minute or two that's when I have a problem.

(Administrative Record at 55.)

Next, the ALJ asked Ross to describe her typical day:

Q: Okay. So, tell me a little bit about your daily activities when you get up in the morning what do you do?
A: I get up at about 6:00 in the morning because I can't stand staying in bed any longer than that, I have to take some medication. So, I get up, the first thing I do is I take my medication, I go to the couch, my husband gets my coffee, in fact I don't even know how to make my coffee anymore. And I lie down on the couch or sit on the couch, try to for a few minutes to read the paper, normally don't get through it, try to drink my coffee and then lie down and sleep until sometimes 10:00. Around then try to get up so that, you know, I at least feel like I'm trying to do something, I try to keep the radio on, I don't watch television because I guess it's my work history, I just feel like during the day I'm

6

doing -- I don't know -- it's hard to explain, it's a
depressing --

Q:     Well, do you do anything around the house, such as
cleaning?

A:     Not anymore, I can't.

Q:     No dishes?

A:     No.

Q:     You cook meals?

A:     No, if I do it's something that I can easily put in the
microwave.   Hy-Vee carries those little meat, you
know, it's a one meat thing or potatoes in the
Tupperware kind of container and I can put those in the
microwave and sit down or lie down and then come
back when -- you know, six minutes when they're
ready.

Q:     Was your condition that way back in December of
2008?

A:     Yes, my husband does all -- he has done all of the
grocery shopping, anything outside of the house in
terms of any kind of errands or anything --

Q:     So --

A:     -- and most of the cooking.

Q:     So, since 2003 through 2008 you haven't done any
driving?

A:     No, sir.

Q:     You haven't been able to do any household chores?

A:     Very little, I might do a load of laundry, half a load of
laundry a week, you know, I might get one half of it in
the washing machine or into the dryer but very rarely
both on -- you know, sometimes I have to wash it again
because it stayed in there too long.

(Administrative Record at 55-57.)

Ross' attorney also questioned Ross about her functional abilities. Ross' attorney
inquired how long Ross could sit upright in a normal chair at a table/desk. Ross answered
that without needing to stand up or move around, she could sit upright in a normal chair
for about 30 minutes. Ross' attorney also inquired how long Ross could sit at a desk and

type. Ross replied that she could sit at a desk and type for "maybe" ten minutes. In response to Ross' attorney's questions, the ALJ asked Ross the following follow-up questions:

> Q: Suppose that you had a job where you could just sit at a table and it was kind of simple tasks, maybe you could, you know, not too demanding, you could stand up every 30 minutes or stand up every hour and stretch and then sit down, would you be able to do something like that?
>
> A: No, I'd need to have a bed to be able to lie down in. My day consists of anything I do I have to lie down, I can tell you after today I'm going to pay for it, I'll be down for probably the next two days at least. . . .
>
> Q: Would you need to lie down once an hour?
>
> A: More than that, I mean I would have to lie down more than that.
>
> Q: About how much of the work day would you have to lie down?
>
> A: I could do a task, maybe, for 10 minutes, if I pushed it a half an hour, and lie down, but if I pushed it I wouldn't be able to get back up, so that would be the rest of the day I'd be lying down.
>
> Q: So, maybe half the work day you'd be lying down?
>
> A: Or more.

(Administrative Record at 75-76.)

### 2. *Vocational Expert's Testimony*

At the hearing, the ALJ questioned the vocational expert and provided him with a hypothetical for an individual who was capable of sedentary work and could:

> occasionally climb, balance, stoop, kneel, crouch, and crawl, but cannot climb ladders, ropes, and scaffolds; would have to stand ever [(*sic*)] 30 minutes for a minute or two[.]

(Administrative Record at 79-80.) The vocational expert testified that under such limitations, Ross could perform her past relevant work as an employment agency manager. The vocational expert also testified that Ross could perform the following unskilled

8

sedentary work: (1) order clerk (2,500 positions in Iowa and 240,000 positions in the nation), (2) telephone clerk (5,000 positions in Iowa and 600,000 positions in the nation), and (3) surveillance monitor (400 positions in Iowa and 10,000 positions in the nation). The ALJ also inquired if the hypothetical person described above needed to lie down for half of the work day, whether he or she would be employable. The vocational expert responded that such a limitation would preclude the individual from full-time work.

Ross' attorney also questioned the vocational expert. Ross' attorney asked if under the ALJ's hypothetical:

> Q: . . . if we changed breaks every 30 minutes to needing to -- needing a break of 10 minutes every 30 minutes, would the past work or the other unskilled work be available?
>
> A: No.
>
> Q: Okay, would any work be available?
>
> A: No.
>
> Q: And as a separate hypothetical, if a person would miss three or more days of work a month, would there be work available?
>
> A: None could be performed.

(Administrative Record at 81.)

### C. Ross' Medical History

On April 12, 2002, Ross was evaluated by Dr. Jay Albright, M.D., at the University of Iowa Hospitals and Clinics ("UIHC"), for neck and arm pain. Dr. Albright noted that Ross had a two-year history of neck pain. Dr. Albright further noted that:

> [Ross] first presented to a physician for headaches. These were posterior base of the skull headaches and she has since noticed . . . sharp pain in her neck and suboccipital region. These are mainly on the left side. When it gets worse such as [with] activity, repetitive neck motion, she gets increase in pain which becomes an aching in the left-side muscles, which then becomes a throbbing, when it is at its worst. This throbbing also results in a headache as well. . . . The only

9

> thing that really helps is avoiding sitting in one position for too
> long or excessive repetitive motion. For the past 2-3 months
> she has had increase in pain now radiating to the bilateral []
> arms. She also complains of two month history of left arm
> numbness and tingling in the ulnar two fingers.

(Administrative Record at 360.) In discussing her daily activities with Dr. Albright, Ross reported that moderate activities, lifting or carrying groceries, and walking more than a mile was "limited a little." However, climbing one flight of stairs, bending, kneeling, and stooping, and walking one block were "not limited at all." Ross also described the severity of her pain as follows: (1) "very bothersome" constant neck pain, (2) "moderately bothersome" right arm pain, (3) "slightly bothersome" left arm pain, (4) "moderately bothersome" continuous back pain, (5) "slightly bothersome" right leg pain, and (6) no left leg pain. As for functional abilities, Ross stated that pain prevents her from: (1) lifting heavy objects, (2) walking more than one hour, and (3) standing more than one hour. She further stated, however, that she could "sit in any chair as long as she likes." Lastly, Ross indicated that pain often interrupts her sleep. Upon examination, Dr. Albright diagnosed Ross with chronic neck pain with some left arm symptoms. Dr. Albright recommended Ross work with the UIHC pain clinic to manage her pain, and prescribed medication as treatment.

On December 19, 2002, Ross met with Dr. Venkateswara R. Karuparthy, M.D., at the UIHC Pain Clinic. Dr. Karuparthy noted that Ross suffered from:

> a long history of chronic low back pain following a motor
> vehicle accident in 1994. She suffered whiplash and was
> unable to work for 4 years after this accident. She did regain
> meaningful work for a period of time but had to quit working
> in 2000 because of severe headaches. In the last 2 months, she
> is again able to hold down [a] full time job involved as a
> director of marketing. She does still suffer from chronic neck
> pain, mostly on the left side, which radiates and causes severe
> headaches. She does have lower back pain, which has a
> component of sciatica bilaterally. She has shoulder and head

> pain without any limitation of range of motion. The pain does
> affect her sleep cycle and she wakes up several times per night
> due to pain.

(Administrative Record at 373.) Upon examination, Dr. Karuparthy diagnosed Ross with chronic myofascial pain syndrome. Dr. Karuparthy opined that Ross would not benefit from any interventional pain techniques, and recommended that she continue using pain medication as treatment.

On October 18, 2004, Ross met with Dr. Kelly Skelly, M.D., regarding chronic pain and depression. Dr. Skelly noted that the Pain Clinic had recently been adjusting Ross' pain medications due to her dependence on narcotic pain medication. Ross was switched to Neurontin, and Ross reported concerns that the Neurontin had the side effect of increasing her depression. Specifically, Dr. Skelly noted that Ross "attributes decreasing mood, teary all the time, suicidal thought without definite plan, and general feeling down over 50% of the time with anxiousness, nervousness, and guilt, low mood to the increasing Neurontin dose[.]"[3] Ross also told Dr. Skelly that she feels like her pain is not under control, and therefore, the pain itself factors into her difficulties with depression. Upon examination, Dr. Skelly diagnosed Ross with major depressive disorder with anxiolytic features and sleep disturbance and chronic pain. Dr. Skelly recommended medication adjustment as treatment.

On April 15, 2009, Dr. L. Griffith, D.O., reviewed Ross' medical records and provided Disability Determination Services ("DDS") with a physical residual functional capacity ("RFC") assessment for Ross. Dr. Griffith determined that Ross could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of at least two hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour

---

[3] Administrative Record at 419.

workday, and (5) push and/or pull without limitations. Dr. Griffith also determined that Ross could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. Dr. Griffith found no manipulative, visual, communicative, or environmental limitations. Dr. Griffith concluded that the generalized pain reported by Ross "is well documented in the file."[4]

On April 21, 2009, Dr. Sandra Davis, Ph.D., reviewed Ross' medical records and provided DDS with a psychiatric review technique assessment for Ross. Dr. Davis diagnosed Ross with depression. Dr. Davis determined that Ross had the following limitations: mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Dr. Davis concluded that:

> In summary, there are gaps in the record regarding depression, but when noted, [Ross] has had mild to moderate symptoms, which have usually responded to medication adjustments. She has not required inpatient psychiatric care nor has she been psychotic. Suicidal thoughts have occurred intermittently, never eventuating in a plan, intent, or an attempt. She has presented with good grooming and hygiene and usually presents with pleasant demeanor. She has increased her exercise. Brief mental status exams do not reflect problems with attention or concentration; memory has been intact. GAF's have ranged from 62 to 70, reflective of mild levels of symptoms. Overall, this appears to be a nonsevere condition.
>
> The medical evidence is consistent. There are no major challenges to the credibility of [Ross'] allegations.

(Administrative Record at 591.)

On August 2, 2011, at the request of Ross' attorney, Ross' treating doctor, Dr. Daniel Baldi, D.O., filled out a questionnaire regarding Ross' functional abilities. At

---

[4] *Id.* at 578.

the time of answering the questionnaire, Dr. Baldi had been Ross' treating doctor for 16 months. Dr. Baldi diagnosed Ross with cervical disc degeneration, cervical spondylosis, lumbar disc degeneration, lumbar spondylosis, fatigue, depression, neck pain, and low back pain. Dr. Baldi opined that Ross was not capable of working a full-time, eight-hour workday. Specifically, Dr. Baldi stated that Ross would be precluded from such work because she suffers from constant pain that is aggravated by sitting, standing, lying down, and walking. Dr. Baldi also noted that Ross has limited range of motion. Dr. Baldi also indicated that during an eight-hour workday, pain aggravated by increased activity would cause Ross to need frequent unscheduled breaks, lasting 10 to 15 minutes. With regard to specific functional abilities, Dr. Baldi opined that Ross could frequently lift less than 10 pounds due to arm, shoulder, and neck pain, and a limited range of motion. Dr. Baldi did not believe that Ross could stand/walk for two hours in an eight-hour workday because standing aggravates pain in her right lower extremity. Dr. Baldi also did not believe that Ross could sit for six hours in an eight-hour workday because "minimal activity increases [her] pain."[5] Lastly, Dr. Baldi opined that Ross should never climb, stoop, kneel, crouch, or crawl because her pain "increases with activity."

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Ross is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment

---

[5] Administrative Record at 675.

> meets the criteria of any Social Security Income listings,
> (4) whether the impairment prevents the claimant from
> performing past relevant work, and (5) whether the
> impairment necessarily prevents the claimant from doing any
> other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. § 404.1520(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful
> activity. If so, the claimant is not disabled. Second, the ALJ
> determines whether the claimant has a severe medical
> impairment that has lasted, or is expected to last, at least
> 12 months. Third, the ALJ considers the severity of the
> impairment, specifically whether it meets or equals one of the
> listed impairments. If the ALJ finds a severe impairment that
> meets the duration requirement, and meets or equals a listed
> impairment, then the claimant is disabled. However, the
> fourth step asks whether the claimant has the residual
> functional capacity to do past relevant work. If so, the
> claimant is not disabled. Fifth, the ALJ determines whether
> the claimant can perform other jobs in the economy. If so, the
> claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC

[(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 404.1545. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. § 404.1545.

The ALJ applied the first step of the analysis and determined that Ross had not engaged in substantial gainful activity from March 31, 2003 through March 31, 2008 her date last insured. At the second step, the ALJ concluded from the medical evidence that Ross had the following severe impairments: mild degenerative disc disease of the cervical spine and myofascial pain/fibromyalgia syndrome. At the third step, the ALJ found that Ross did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Ross' RFC as follows:

> [Ross] had the residual functional capacity to perform sedentary work . . . with the following additional limitations: she could occasionally climb, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, scaffolds.

(Administrative Record at 13.) Also at the fourth step, the ALJ determined that through her date last insured, March 31, 2008, Ross was capable of performing her past relevant work as an employment agency manager. Therefore, the ALJ concluded that Ross was not disabled.

## B. Objections Raised By Claimant

Ross argues that the ALJ erred in three respects. First, Ross argues that the ALJ failed to properly evaluate the opinions of Dr. Baldi, her treating physician. Second, Ross argues that the ALJ failed to properly evaluate her subjective allegations of pain and disability. Lastly, Ross argues that the ALJ failed to consider and properly address a third-party statement from her husband, William Ross.

### 1. Dr. Baldi's Opinions

Ross argues that the ALJ failed to properly evaluate the opinions of her treating physician, Dr. Baldi. Specifically, Ross argues that the ALJ failed to properly weigh Dr. Baldi's opinions. Ross also argues that the ALJ's reasons or lack of reasons for discounting Dr. Baldi's opinions are not supported by substantial evidence in the record. Ross concludes that this matter should be remanded for further consideration of Dr. Baldi's opinions.

The ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence of the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.'*Id.*.); *Strongson v. Barnhart,* 361 F.3d 1066, 1070 (8th Cir.

2004) (an ALJ does not need to give controlling weight to a physician's RFC if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ). The ALJ may discount or disregard a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hamilton v. Astrue*, 518 F.3d 607, 609 (8th Cir. 2008).

Also, the regulations require an ALJ to give "good reasons" for assigning weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion from a treating source is not given controlling weight, then the ALJ considers the following factors for determining the weight to be given to all medical opinions: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(c)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)). The decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. SSR *96-2P*, 1996 WL 374188 (1996).

In addressing Dr. Baldi's opinions, the ALJ noted that:

> As for opinion evidence, the undersigned has considered the
> opinion of Dr. Baldi; however, the assessment was based on

> a treatment history subsequent to the date last insured and
> therefore, has been accorded little weight.

(Administrative Record at 17.) Ross asserts that even though Dr. Baldi's opinions are from a period after her "date last insured," the ALJ erred by not addressing whether Dr. Baldi's opinions were consistent with the administrative record, including the medical evidence in the record from the relevant insured time period. *See Krogmeier v. Barnhart*, 294 F.3d 1019 (8th Cir. 2002) (rejecting opinions provided by a treating doctor after the claimant's "date last insured" because the opinions were inconsistent with the doctor's own treatment notes during the relevant insured period); *Tilley v. Astrue*, 580 F.3d 675 (8th Cir. 2009) (determining that the opinions of a doctor provided after the claimant's "date last insured" could not be disregarded because the opinions were consistent with the administrative record, including the doctor's own treatment notes from the relevant insured period). Ross concludes that:

> Because the ALJ did not offer a good reason for disregarding
> Dr. Baldi's opinion as to Ms. Ross's work limitations, and
> because the ALJ did not address whether Dr. Baldi's opinion
> was consistent or inconsistent with the record, the ALJ's
> determination that Ms. Ross can perform her past work is not
> supported by substantial evidence on the record as a
> whole. . . . Consequently, at minimum, a remand is required
> for a proper consideration [of] Dr. Baldi's opinion and
> Ms. Ross's claim.

Ross' Brief (docket number 12) at 12.

In response, the Commissioner points out that:

> [Ross] cites *Tilley v. Astrue*, 580 F.3d 675, 680-81 (8th Cir.
> 2009), where the court held that the ALJ improperly
> disregarded a treating physician's opinion that was dated two
> years after the claimant's date last insured because the opinion
> was consistent with the physician's treatment notes. . . .
> However, in *Tilley*, the treating source had actually treated
> [the claimant] prior to [the claimant's] date last insured. . . .
> In this case, Dr. Baldi did not start treating [Ross] until March

2010, two years after the expiration of her insured status. Therefore, the rationale of *Tilley* does not apply here.

The ALJ's discussion of the medical evidence and evaluation of [Ross'] credibility makes clear that he discredited the portions of Dr. Baldi's opinion that were inconsistent with the evidence as a whole.

Commissioner's Brief (docket number 17) at 17-18. The Court agrees with the Commissioner. Not only did Dr. Baldi provide his opinion nearly 3.5 years after Ross' relevant insured period, but Dr. Baldi also did not begin treating Ross until two years after her relevant insured period. Thus, *Krogmeier* and *Tilley* are distinguishable because in those cases the doctor in question actually treated the claimant during the relevant insured period. Furthermore, the ALJ thoroughly addressed Ross' medical history during the relevant insured period. In reviewing the ALJ's decision, particularly the ALJ's review of Ross' medical history during the relevant insured period, it is clear to the Court that Dr. Baldi's 2011 opinions are inconsistent with Ross' medical history through March 31, 2008.[6] Moreover, in reviewing the entire record, it is evident to the Court that Dr. Baldi's treatment notes from March 2010 through July 2011 are inconsistent with his opinions from August 2011. Dr. Baldi's treatment notes from March 2010 through July 2011, generally show that Dr. Baldi believed Ross was doing fairly well and her pain was controlled by medication.[7] Even though the ALJ did not explicitly state that Dr. Baldi's treatment notes are inconsistent with his opinions from the August 2011 functional ability report for Ross, it is clear from a review of the treatment notes that an inconsistency exists. Therefore, having reviewed the entire record, the Court finds that while the ALJ could have explained his reasoning in a more explicit manner, nevertheless, the ALJ

---

[6] *See* Administrative Record at 13-15 (ALJ's discussion of Ross' medical history during the relevant insured time period).

[7] *See* Administrative Record at 603-628 (Dr. Baldi's treatment notes).

properly considered and addressed the opinion evidence provided by Dr. Baldi. Accordingly, even if inconsistent conclusions could be drawn on this issue, the court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 301.

## 2. *Credibility Determination*

Ross argues that the ALJ failed to properly evaluate her subjective allegations of pain and disability. Ross maintains that the ALJ's credibility determination is not supported by substantial evidence. The Commissioner argues that the ALJ properly considered Ross' testimony, and properly evaluated the credibility of her subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ should also consider a "a claimant's work history and the absence of objective medical evidence to support the claimant's complaints[.]" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citing *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ, however, may not disregard a claimant's subjective complaints "'solely because the objective medical evidence does not fully support them.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009)).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman*, 596 F.3d at 968; *see also Finch*, 547 F.3d at 935 (same); *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may

not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors.'" *Renstrom*, 680 F.3d at 1066 (quoting *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010)); *see also Ford*, 518 F.3d at 982 (An ALJ is "required to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reason for doing so); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

In his decision, the ALJ determined that:

> After careful consideration of the evidence, the undersigned finds that [Ross'] medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, [Ross'] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The medical record supports long-term pharmacological management of chronic pain with combinations of narcotic medication and evidence of opioid tolerance. However, objective diagnostic studies, current and remote, fail to support more than mild degenerative changes of the spine. In addition, physical and neurological examinations were essentially non-focal. Despite the endorsement of severe, debilitating pain levels, [Ross] appeared in no acute distress. She was generally pleasant and cooperative except when reactive to brief changes in drug therapies. Further, [Ross] reported efficacy of treatment and increased activity levels inconsistent with the alleged functional limitations. Side-effects were minimal and resolved with modification in dosages. Mental status examinations were intact without evidence of habit deterioration. In addition, [Ross] denied symptoms involving mental health symptomatology. She further denied headaches upon review of systems, and the medical record failed to support the level of headache frequency or intensity that she alleged. Activities of living were self-limited and inconsistent with the level of activity reported to treating sources. For the aforementioned reasons, the undersigned finds [Ross] less than fully credible or as functionally limited as she alleged, prior to December 31, 2008.

(Administrative Record at 16-17.)

It is clear from the ALJ's decision that he thoroughly considered and discussed Ross' treatment history, medical history, functional restrictions, activities of daily living, and effectiveness of medications in making his credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Ross' subjective allegations of disability were not credible.[8] *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective

_____

[8] *See* Administrative Record at 15-17.

complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Ross' subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 3. Third-Party Statement

Ross argues that the ALJ improperly discredited third-party statements from non-medical sources regarding her complaints of disability. Specifically, Ross asserts that the ALJ failed, in any manner, to address or consider the statements of her husband, William Ross. Ross maintains that this matter should be remanded to allow the ALJ to both fully consider and address her husband's statements regarding her disability.

When considering third-party testimony concerning a claimant's symptoms or difficulties with pain, the regulations provide that an ALJ must "'carefully consider any other information you may submit about your symptoms,' including statements 'other persons provide about your pain or other symptoms.'" *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1529(c)(3)); *see also Willcockson v. Astrue*, 540 F.3d 878, 880-81 (8th Cir. 2008) ("[S]tatements of lay persons regarding a claimant's condition must be considered when an ALJ evaluates a claimant's subjective complaints of pain."). In other words, an ALJ should not ignore the statements of other parties regarding a claimant's condition. *Willcockson*, 540 F.3d at 881. However, in *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992), the Eighth Circuit Court of Appeals determined that failure to provide any reasons for discrediting a third-party witness is not error when support for discrediting such a witness is found in the same evidence used by

an ALJ to find that a claimant's testimony is not credible. *See also Lorenzen v. Chater*, 71 F.3d 316, 319 (8th Cir. 1995) ("[A]lthough the ALJ failed to list specific reasons for discrediting the testimony of Carol Bennett, it is evident that most of her testimony concerning Lorenzen's capabilities was discredited by the same evidence that discredits Lorenzen's own testimony concerning his limitations."); *Buckner*, 646 F.3d at 559-60 (discussing *Robinson* and *Lorenzen* and applying that reasoning to testimony from the claimant's girlfriend).

Here, the ALJ did not address Ross' husband's statements and failed to make a credibility determination with regard to those statements. The Commissioner maintains that *Buckner* applies in this case, and asserts that "the same evidence that the ALJ used to refute [Ross'] allegations also refutes any allegations of [Ross'] husband that were inconsistent with the ALJ's finding."[9] In *Buckner*, the Eighth Circuit determined that "although the ALJ did not expressly address the girlfriend's statement in his decision, the ALJ's error does not require remand. . . . [M]uch like the third-party statements in *Robinson* and *Lorenzen*, the same evidence that the ALJ referred to in discrediting Buckner's claims also discredits the girlfriend's claims." 646 F.3d at 560. Because the ALJ sufficiently assessed Ross' credibility, and the evidence that the ALJ referred to in discrediting Ross' claims also discredits her husband's claims, the Court concludes that ALJ's failure to address Ross' husband's statements "had no bearing on the outcome of [Ross'] case and does not require remand." *Id.*

## VI. CONCLUSION

The Court finds that the ALJ properly considered the medical evidence and opinions in the record, including the opinions of Dr. Baldi. The ALJ also properly determined Ross' credibility with regard to her subjective complaints of pain and disability. Lastly, the Court concludes that the ALJ's failure to address Ross' husband's statements regarding

---

[9] Commissioner's Brief (docket number 17) at 14.

her allegations of disability is harmless error and does not require remand because the evidence that the ALJ referred to in discrediting Ross' claims in his credibility determination for Ross also discredits her husband's claims. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## *VII. ORDER*

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;

2. Plaintiff's Complaint (docket number 2) is **DISMISSED** with prejudice; and

3. The Clerk of Court is directed to enter judgment accordingly.

DATED this _____ day of February, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA